IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LATRICIA PRATER, | CASE NO. 1:13CV2623 |
| Plaintiff, | |
| | JUDGE SARA LIOI |
| v. | |
| | MAGISTRATE JUDGE |
| | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | |
| SECURITY ADMINISTRATION, | |
| | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Latricia Prater ("Prater") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income benefits ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

### I. Procedural History

Prater filed an application for SSI on October 19, 2007.  Tr. 11.  The claim was denied and Prater did not appeal. Tr. 11.  She filed another application for SSI on October 22, 2009.  Tr. 11.  The claim was denied and Prater did not appeal.[1]  Tr. 11.  On September 21, 2011, Prater filed an application for Disability Insurance Benefits ("DIB").  Tr. 11.  The claim was denied and Prater did not appeal.  Tr. 11.

---
[1]  It is not evident from the record what Prater's alleged disability was in her prior applications.

1

The SSI application at issue in this case was Prater's third, filed on September 28, 2011, and alleging a disability onset date of June 26, 2009.  Tr. 140-145, 190.  She alleged disability based on the following: scoliosis, lumbosacral strain, "cracked bone in wrist" and "pulled tissues in back of left knee."  Tr. 190, 194.  After denials by the state agency initially (Tr. 87-89) and on reconsideration (Tr. 93-95), Prater requested an administrative hearing.  Tr. 100-102.  A hearing was held before Administrative Law Judge ("ALJ") Susan Giuffre on December 3, 2012.  Tr. 24-55.  In her January 17, 2013, decision (Tr. 11-19), the ALJ determined that Prater's residual functional capacity ("RFC") did not prevent her from performing past relevant work as a housekeeper and spot welder, i.e., she was not disabled.  Tr. 19.  Prater requested review of the ALJ's decision by the Appeals Council (Tr. 6-7) and, on October 29, 2013, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Prater was born in 1977 and was 32 years old on the date her application was filed.  Tr. 190.  She has an eleventh grade education and is able to communicate in English.  Tr. 193, 195.  She last worked in 2008 as an ambulette driver.[2]  Tr. 29, 180.  She had previously worked as a telemarketer, punch press operator, housekeeper, spot welder and dispatcher.  Tr. 29-34.  She also worked out of her home braiding hair.  Tr. 36-37.   In the 15 years prior to her alleged onset date, she had minimal earnings averaging about $1,200 a year.  Tr. 159.

---

[2]  Prater wrote "ambulette driver" on her work history report (Tr. 180); the transcript from the hearing reads "ambulant driver" (*e.g*., Tr. 50); and the vocational expert cited "ambulance driver" in the Dictionary of Occupational Titles at 913.683-010. (Tr. 50).  The difference does not affect the outcome of this case.  The undersigned will hereinafter refer to Prater's past work as "ambulette driver."

B.  **Relevant Medical Evidence**[3]

On September 14, 2005, Prater was admitted to Fairview Hospital after she fell in the bathtub, hit her head and lost consciousness.  Tr. 247.  On September 16, 2005, a psychiatric consultation was requested after Prater showed significant memory loss.  Tr. 269.  Roman Dale, M.D., listed two possible diagnoses: conversion disorder with age regression based on histrionic response to an unknown trauma or a psychotic disorder.  Tr. 270.  On September 17, 2005, Prater was discharged to a psychiatric unit.  Tr. 247.  There are no further records regarding this issue.

In 2010 and 2011, Prater went to the emergency room at Marymount Hospital for treatment on multiple occasions.  On October 20, 2010, Prater presented to the emergency room complaining of neck pain.  Tr. 454.  She denied previous symptoms and indicated that the pain had started the day before.  Tr. 454.  An x-ray of her cervical spine showed no evidence of an acute fracture or subluxation. Tr. 465.  Prater was diagnosed with torticollis, muscle spasms in the neck.  Tr. 455, 459.

On December 3, 2010, Prater presented to the emergency room complaining of moderate pain in both legs.  Tr. 437.  An ultrasound revealed no evidence of deep vein thrombosis.  Tr. 448.

On February 13, 2011, Prater presented to the emergency room complaining of "neck pain all the way down her back."  Tr. 421.  Prater was observed crying and "acting very strangely."  Tr. 421.  Her back was painful to the touch.  Tr. 421.  Kathleen Holt, physician's assistant, diagnosed Prater with torticollis and back spasms.  Tr. 421.  Holt noted, "I do not think

---

[3] Prater argues that the ALJ erred in determining Prater's Residual Functional Capacity ("RFC") because the ALJ failed to "adequately address all the limitations resulting from Prater's severe impairments."  Doc. 14, p. 11.  Although there are medical records regarding Prater's right wrist, the ALJ did not determine that Prater's right wrist problems were severe and Prater does not assert that the ALJ committed error regarding that issue.  Accordingly, the Court does not recite Prater's medical records concerning her right wrist.

anything acutely is going on with this patient." Tr. 421. Dr. Al Austria, M.D., examined Prater and agreed with Holt's impressions. Tr. 421.

On June 23, 2011, Prater presented to the emergency room complaining of moderate left leg pain. Tr. 405. An x-ray revealed no injury and an ultrasound revealed no evidence of deep vein thrombosis. Tr. 415, 416.

On July 1, 2011, Prater presented to the emergency room complaining of headaches, a stiff neck and sore throat. Tr. 383. A CT scan of Prater's brain was normal. Tr. 396. A CT scan of her cervical spine showed a reversal of the cervical lordotic curvature into a mild kyphosis consistent with muscle spasm and minor subluxations at C3-4, C4-5 and C5-6 consistent with ligamentous laxity. Tr. 395. There was no evidence of fracture or arthritis. Tr. 395. Prater was diagnosed with a cervical paraspinal muscular strain. Tr. 391.

On September 19, 2011, Prater presented to the emergency room complaining of moderate to severe back pain. Tr. 360. She was diagnosed with a lumbosacral strain. Tr. 362.

On December 6, 2011, Prater underwent an MRI of her lumbar spine. Tr. 575. The results indicated a long segment level scoliosis at the thoracolumbar juncture and mild facet degenerative changes in the lower lumbar spine. Tr. 575.

On January 11, 2012, Prater presented to the emergency room complaining of severe chest pain. Tr. 498. She reported that her father died of a heart attack and that she worries that she will too. Tr. 498. She also stated that she worries a lot and "stresses about a lot of things." Tr. 505. An x-ray revealed no acute cardiopulmonary abnormality. Tr. 507. Prater was diagnosed with chest pain, unclear etiology. Tr. 500.

On March 14, 2012, Prater saw Colleen Clayton, M.D. Tr. 561. Prater reported left arm numbness, left hand swelling, heaviness in her legs and pain from the knees down. Tr. 561. She

also complained of chronic pain, although she reported no neck pain that day.  Tr. 561.  Dr. Clayton noted that Prater was tearful because "she is sick of living in pain."  Tr. 561.  Dr. Clayton observed that Prater was noncompliant with physical therapy—Prater explained that her first session was not helpful so she did not follow up.  Tr. 561.   Prater reported worsening insomnia but admitted to taking frequent naps and having no routine.  Tr. 561.

Upon physical examination, Prater was alert, cooperative, pleasant, in no acute distress but tearful at times.  Tr. 562.  Her heart rate was regular.  Tr. 562.  Dr. Clayton noted that Prater's cranial nerves were grossly intact and that she had symmetrical reflexes, normal muscle tone and strength and a normal gait.  Tr. 562.

On April 19, 2012, Prater presented to the emergency room complaining of left-side arm pain.  Tr. 533.  An evaluation was negative but Prater and her family insisted upon admission.  Tr. 533.  Prater was examined by Anil Pai, M.D.  Tr. 533-535.  Dr. Pai observed that Prater's affect was "unusual" when he asked her about her pain.  He commented, "she was crying, but she would crack many jokes and she was noticed to be joking and laughing with her husband and her other visitor."  Tr. 533.  Prater stated that the pain was present intermittently for one month but that she came to the emergency room because "she was feeling a little numb on the left side."  Tr. 533.  Dr. Pai noted that when Prater initially came to the emergency room she said she was there for back pain but that Prater later said the main reason was left forearm pain.  Tr. 533.  When Dr. Pai asked Prater about her back pain, she first said it was upper back pain, then she said it was lower back pain, then she said back pain was not the reason she was at the emergency room.  Tr. 533.

Upon physical examination, Dr. Pai noted that Prater had no neck stiffness.  Tr. 534.  She had full power in her legs and no edema or tenderness.  Tr. 534.  Dr. Pai observed that Prater's

5

straight leg raising "was actually very good until 90 degrees though the patient would intermittently put some resistance and claim that she could not lift it any further, but I was able to raise it all the way up to 90 degrees." Tr. 534. Dr. Pai found that Prater had tenderness and swelling in her left forearm of unclear etiology. Tr. 535. An x-ray revealed no injury. Tr. 539. An ultrasound showed normal flow and compression. Tr. 538. Prater had a pain management consultation because of her complaints of severe lower back pain. Tr. 536. An examination noted paraspinal muscle pain on palpitation of Prater's back and lumbar spine. Tr. 538. Her left forearm was painful to light touch. Tr. 538. Prater was discharged on April 23, 2012, with a diagnosis of: myalgia and myositis; disturbance of skin sensation; lumbago; pain in the joint of her upper arm; limb swelling; scoliosis, idiopathic; syndrome affective cervical region; tobacco use disorder; obesity; and chronic pain. Tr. 531-532.

An MRI of Prater's left forearm on May 18, 2012, revealed a small amount of nonspecific edema. Tr. 557.

Prater saw Dr. Clayton again on October 26, 2012. Tr. 567. The treatment note reads, "needs forms completed for lawyer." Tr. 567. Dr. Clayton noted that Prater suffers from chronic pain and depression. Tr. 567. Prater reported that most of her pain is in her lower back, left arm and left knee. Tr. 567. Prater stated that she completed eight weeks of physical therapy but it did not help her symptoms. Tr. 567. She complained about being depressed because of her pain and problems sleeping. Tr. 567. She reported that she does not feel she can work. Tr. 567. Dr. Clayton "had [a] long discussion how working a few days might help her" with symptoms. Tr. 567.

Upon physical examination, Prater's back was straight and symmetric with a full range of motion, but was tender along the lumbar spine and paraspinal muscles to light palpation. Tr. 568.

6

Her legs had symmetric reflexes and normal motor strength and sensation. Tr. 568. Her left arm had mild edema, especially in the fingers, mild tenderness and a "brisk radial pulse." Tr. 568. Dr. Clayton prescribed medication for pain, depression and insomnia. Tr. 568.

### C. Medical Opinion Evidence

#### 1. Treating Source

During Prater's visit on October 26, 2012, Dr. Clayton completed a Physician Questionnaire (Psychological) and a Physician Questionnaire (Physical). Tr. 488-491. In the psychological questionnaire, Dr. Clayton reported that Prater suffers from depression. Tr. 488. Her symptoms include fatigue, depressed mood and chronic pain. Tr. 488. Dr. Clayton opined that Prater's ability to sustain an eight-hour work day, five days per week, would be "difficult due to her depression would do better with fewer hours several days per week." Tr. 488. She reported that most days Prater experiences symptoms severe enough to interfere with her attention and concentration necessary to perform simple tasks. Tr. 488. She stated that Prater would have difficulty maintaining a schedule, does not do well with stress and is a poor decision maker. Tr. 489. Dr. Clayton commented that Prater gets along well with others. Tr. 489.

In the physical questionnaire, Dr. Clayton reported that Prater suffers from chronic pain and chronic fatigue. Tr. 490. Her symptoms include "chronic daily back and left arm pain, stiffness left knee, chronic fatigue, insomnia." Tr. 490. Dr. Clayton opined that Prater can sit for two hours in an eighth-hour workday and can walk or stand no more than fifteen minutes at a time, for a total of one to two hours daily. Tr. 490. Prater can occasionally lift five pounds. Tr. 491. She needs unscheduled breaks every fifteen to thirty minutes in order to stretch and change position. Tr. 491. She could be expected to miss two to three days a week, for a total of fifteen days per month, and would need additional time off "during pain flares." Tr. 491.

7

**2. Consultative Examiners**

**a. Edward Butler, M.D.**

On December 1, 2011, Edward Butler, M.D., consultatively examined Prater. Tr. 470-78. Prater complained of back pain radiating down her left leg, causing sharp constant pain she evaluated as ten out of ten. Tr. 470. She reported sharp constant pain in her left knee and evaluated the pain as ten out of ten. Tr. 470-471. She complained of sharp constant neck pain and evaluated the pain as eight out of ten. Tr. 471.

Upon physical examination, Prater did not appear to be in acute distress. Tr. 472. She had an antalgic gait on the left side, but could walk on her heels and toes without difficulty. Tr. 472. She could perform a partial squat and rise to 40 degrees of flexion at her knees. Tr. 472. Her stance was normal and she used no assistive device. Tr. 472. Prater required no help changing for the examination or getting on and off the table and rose from her chair without difficulty. Tr. 472. Her neck was supple and her chest and heart were normal. Tr. 473. She had a normal range of motion in her cervical spine, shoulders, wrists, hands, and knees but reduced range of motion in her lumbar spine. Tr. 476-78.

Dr. Butler diagnosed Prater with mild scoliosis of the thoracolumbar spine to the left side; left knee pain, etiology undetermined; cervical sprain; history of memory loss; obesity; chronic headache; and chest pain, etiology undetermined. Tr. 474. Regarding Prater's work capacity, Dr. Butler opined that Prater should avoid respiratory irritants and had mild limitations in pushing, pulling and lifting. Tr. 474.

**b. Michael Faust, Ph.D.**

On December 7, 2011, psychologist Michael Faust, Ph.D., consultatively examined

8

Prater.  Tr. 481-87.  Prater stated that she applied for social security benefits because of her constant and debilitating back pain and left knee problems.  Tr. 481.  Upon mental status examination, Prater was neat and clean and was wearing appropriate clothing.  Tr. 484.  She appeared to be depressed, anxious, tearful and sad with a blunted affect.  Tr. 484.  She remained polite and cooperative throughout the examination.  Tr. 484.  Dr. Faust commented that Prater was articulate and had normal speech, organized and coherent thoughts and appropriate responses.  Tr. 484.  She showed no difficulty understanding questions or instructions, including complex or multi-step ones, but lost her train of thought during mental status tasks.  Tr. 484.

Dr. Faust diagnosed Prater with adjustment disorder mixed with anxiety and depressed mood.  Tr. 486.  He gave Prater a Global Assessment of Functioning (GAF) score of 60, indicating moderate symptoms.[4]  Dr. Faust opined that Prater's lapses in sustained attention made it difficult for her to fully remember what she has been told, and that she would likely have difficulty recalling what needs to be done in the work place to follow through with completing tasks.  Tr. 486.  Dr. Faust commented that Prater's lack of attention is due to her adjustment disorder, which is in the moderate range.  Tr. 486-487.  He noted that Prater is not in counseling nor is she being treated with psychiatric medications.  Tr. 487.

### 3. State Agency Opinions

#### a. Mental Review

On January 10, 2012, Katherine Fernandez, Psy.D., a state agency psychologist, reviewed Prater's record.  Tr. 57-64, 66-68.  Regarding Prater's mental RFC capacity, Dr. Fernandez opined that Prater had moderate limitations in her ability to maintain attention and

---

[4] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id*.

concentration for extended periods; moderate limitations in her ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and moderate limitations in her ability to respond appropriately to changes in the work setting. Tr. 66-67. She opined that Prater could perform a wide variety of tasks in a relaxed setting and would do best with a predictable routine. Tr. 66. She commented that Prater could interact with others but should not be in sales or customer service positions requiring close interactions. Tr. 67.

On April 14, 2012, state agency psychologist Dr. Bonnie Katz, Ph.D, reviewed Prater's record and affirmed Dr. Fernandez's assessment. Tr. 79-80.

### b. Physical Review

On December 13, 2011, Sarah Long, M.D., a state agency physician, reviewed Prater's record. Tr. 64-65. Regarding Prater's physical RFC capacity, Dr. Long opined that Prater would be capable of lifting twenty pounds occasionally and ten pounds frequently; standing and/or walking with a normal break for a total of six hours in an eight hour work day; sitting a total of six hours in an eight hour work day; and frequently climbing ramps, stairs, ladders, ropes and scaffolds and frequently balancing and stooping. Tr. 64-65.

On April 13, 2012, state agency physician Maureen Gallagher, D.O., reviewed Prater's record and affirmed Dr. Long's assessment. Tr. 77-78.

## E. Testimonial Evidence

### 1. Prater's Testimony

Prater was represented by counsel and testified at the administrative hearing. Tr. 26-48. She testified that her last job was as an ambulette driver and that she held that position for three

months. Tr. 29. She also worked as a telemarketer for three months in 2007, operated a punch press in a sewing factory for six months in 2004, performed housekeeping for about one month in 2004, and was a spot welder for four months in 1997. Tr. 30-34. She was also a dispatcher for a few months and worked out of her home braiding hair "for a couple of years." Tr. 34, 36

Prater testified that she is unable to work because of "the stress, the depression to my scoliosis to the numbness in both my arms and my hands." Tr. 35. Her scoliosis limits her ability to stand for more than ten or fifteen minutes. Tr. 36. She has trouble sitting and lying in bed and instead spends time in a recliner, keeping her back "at an angle." Tr. 38, 45. Prater also stated that she has memory loss from when she fell and hit her head. Tr. 40. She is unable to remember things that happened a few days previously. Tr. 41. She has difficulty sleeping because of pain. Tr. 43. She cries often because of depression, although she is not taking medication for it because she does not want to take any more pills. Tr. 43. She testified that she is currently taking Tramadol for her neck, a pill for her chest pains and hydrocodone. Tr. 44.

Prater testified that she lives with her mother. Tr. 41. She washes dishes except for heavier items that she is unable to lift. Tr. 41. She spends most of her time in her recliner watching television. Tr. 42. She is able to concentrate and follow the television shows that she watches. Tr. 45-46. She denied having any problems with her concentration. Tr. 46. She testified that she is unable to get out of bed about once a week because of her pain. Tr. 46. She occasionally walks with a cane for stability, although the cane is not prescribed. Tr. 46-48.

### 2. Vocational Expert's Testimony

Vocational Expert Mark Anderson ("VE") testified at the hearing. Tr. 48-57. The ALJ discussed with the VE Prater's past relevant work as an ambulette driver, telemarketer, housekeeper, spot welder, dispatcher and cosmetologist braiding hair. Tr. 50. The ALJ asked

the VE to determine whether a hypothetical individual of Prater's age, education and past relevant work experience could perform any of the jobs she performed in the past if that person had the following characteristics: a capacity for light work, who could frequently climb ramps and stairs but no more than occasionally climb ladders, ropes or scaffolds, who could frequently balance, frequently stoop, who has the ability to understand, remember and follow through a wide variety of tasks but in a relaxed setting, capable of making simple decisions, able to interact with others but should avoid sales or customer service requiring close interaction and who could adapt to occasional changes. Tr. 51.  The VE testified that the person could perform Prater's past relevant work as a housekeeper and spot welder.  Tr. 51.

Prater's attorney asked the VE what the acceptable rate of absenteeism is for those jobs. Tr. 52.  The VE answered that an individual consistently missing three or more days a month would be terminated. Tr. 52.  When asked about the probationary period of those jobs, the VE answered that he counsels employees to not miss any time during the first thirty days of work or however long the probationary period lasts.  Tr. 52.  Prater's attorney next asked the VE to consider a hypothetical individual with characteristics previously described by the ALJ but who could only stand for ten to fifteen minutes at a time, then have to sit for thirty minutes, then would need to get up to stand again for ten to fifteen minutes before sitting for thirty minutes, and could lift less than five pounds.  Tr. 52.  The VE responded that there would be no jobs for such an individual. Finally, Prater's attorney asked the VE to consider a hypothetical individual with characteristics previously described and with one additional limitation: the individual would be off task for twenty percent of the time because of pain or problems with depression and anxiety.  Tr. 52.  The VE answered that such an individual would not be able to meet production standards.  Tr. 53.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her January 17, 2013, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since September 26, 2011, the application date. Tr. 13.

2. The claimant has the following severe impairments: Spine disorder-scoliosis, affective disorder, anxiety related disorder, and obesity. Tr. 13.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[6] Tr. 14.

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except climbing ramps/stairs frequently, climbing ladders/ropes/scaffolds occasionally, balancing frequently, stooping frequently, able to understand, remember, and follow through a wide variety of tasks in a relaxed setting, able to make simple decisions, able to interact with others but should avoid sales or customer service requiring close interactions, and able to adapt to occasional changes. Tr. 15.

5. The claimant is capable of performing past relevant work as a housekeeper and spot welder. This work does not require the

---

[5] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[6] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

        performance of work-related activities precluded by the claimant's residual functional capacity. Tr. 19.

6.     The claimant has not been under a disability, as defined in the Social Security Act, since September 26, 2011, the date the application was filed. Tr. 19.

### V. Parties' Arguments

Prater objects to the ALJ's decision on one ground. She asserts that the ALJ's decision is not supported by substantial evidence because the RFC determined by the ALJ does not adequately address all the limitations resulting from Prater's severe impairments. In response, the Commissioner submits that the ALJ's decision is supported by substantial evidence.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Prater contends that the ALJ failed to adequately address all the limitations resulting from Prater's severe impairments in the RFC because the ALJ improperly weighed the medical opinions. Doc. 14, p. 11. Prater contends that the ALJ improperly weighed the treating source

opinion of Dr. Clayton, the opinion of consultative examiner Dr. Faust, and the opinion of state agency consultant Dr. Fernandez. Doc. 14, pp. 11-12. The ALJ assigned "less weight" to Dr. Clayton's opinion, "some weight" to Dr. Faust's opinion, and "more weight" to Dr. Fernandez's opinion. Tr. 17-18.

### A. The ALJ did not err in giving less weight to the treating source opinion

Generally, an ALJ must give the opinion of a treating source controlling weight if she finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ considered the factors in 20 C.F.R. § 416.927(a)-(d) in assigning less weight to Dr. Clayton's opinion. First, the ALJ explained that Dr. Clayton only saw Prater twice, in March 2012 and October 2012. Tr. 18. *See* 20 C.F.R. § 416.927(c)(2)(i)("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). The ALJ then pointed out that the second visit was not a regular office visit but a visit arranged for the purpose of having Dr. Clayton fill out disability forms. Tr. 19; 567. *See* 20 C.F.R. § 416.902 ("We will not consider an

16

acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability."). See also *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 506 (6th Cir. 2006) ("The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[,]" quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).

     Finally, the ALJ noted that much of Dr. Clayton's opinion is based on Prater's own statements. Tr. 19. The ALJ observed that objective medical evidence did not support Prater's allegations of pain and limitations. Tr. 16. For example, the ALJ identified results from an x-ray and a CT scan of Prater's cervical spine that show "no evidence of fracture and no significant arthritic change." Tr. 16. Results from an x-ray and ultrasounds of Prater's legs were normal. Tr. 17. Her chest x-ray was normal. Tr. 17. An MRI of Prater's left arm was mostly normal with a small amount of nonspecific edema. Tr. 17. Physical examinations repeatedly found that Prater "generally has normal muscle strength, sensation, and range of motion." Tr. 16. The ALJ also remarked upon Prater's "inconsistent" behavior, such as laughing and joking while in the emergency room with complaints of pain and later eating fast food from her hospital bed without demonstrating behavior associated with pain. Tr. 16. The ALJ's reasoning is consistent with the regulations. See 20 C.F.R. § 416.927(a)-(d); s*ee also* 20 C.F.R. § 416.902 ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such

17

deference when supported by objective medical evidence."). Thus, the ALJ did not err in assigning less weight to Dr. Clayton's opinion than to the opinion of Dr. Ferdandez.

### B. The ALJ did not err in giving some weight to Dr. Faust's opinion

Prater argues that the ALJ should have given Dr. Clayton's opinion significant weight because it was consistent with the opinion of consultative psychologist Dr. Faust. Doc. 14, p. 12. In addition, Prater asserts that, because Dr. Faust found that Prater experienced lapses in sustained attention and would have difficulty completing tasks in a work environment, Dr. Faust's opinion is consistent with Dr. Clayton's opinion and should also have been given more weight. Doc. 14, p. 12.

The ALJ gave Dr. Faust's opinion some weight, recognizing that he met with Prater and administered various tests. Tr. 18. The ALJ also noted, however, that Dr. Faust assessed a GAF of 60, which is indicative of moderate limitations, and that Dr. Faust's opinion depended on Prater's subjective statements. As previously discussed, the ALJ observed that Prater's inconsistent behavior did not support her allegations of pain and limitations. The ALJ also commented that Prater's lack of treatment and her choice of treatment belied her allegations of pain and limitations. Tr. 16. Specifically, the ALJ observed that Prater had not been compliant with physical therapy and has not pursued treatment measures for her mental ailments. Tr. 16-17. The ALJ also referred to Dr. Faust's opinion as "vague." Tr. 18. Dr. Faust's opinion did not specify the degree of limitations in functional areas. *See* Tr. 486-487. The ALJ provided for mental limitations in the RFC by limiting Prater to performing light work involving the ability to understand, remember and follow through tasks in a relaxed setting; make simple decisions; interact with others while avoiding sales or customer service requiring close interactions; and

adapt to occasional changes.  Tr. 15.  Thus, the ALJ did not err in assigning some weight to Dr. Faust's opinion.

### C. The ALJ did not err in giving more weight to Dr. Fernandez's opinion

Prater next argues that the ALJ's failure to give greater weight to the opinions of Drs. Clayton and Faust "is even more inexplicable when the opinion of the state agency non-examining consultant is reviewed."  Doc. 14, p. 12.  Prater asserts that state agency consultant Dr. Fernandez's opinion is inconsistent with the record because she "completely minimized the limitations found by Dr. Faust," her opinion is not supported by the evidence, and is inconsistent with the opinions of "examining medical sources."[7]  Doc. 14, p. 12.

Dr. Fernandez observed that Dr. Faust assessed Prater's current level of functioning.  Tr. 64.  Dr. Fernandez opined that Prater was moderately limited in her ability to sustain attention and concentration for extended periods, to complete a normal weekday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting.  Tr. 66-67.  She opined that Prater could understand, remember and follow through tasks in a relaxed setting and would do best with a predictable routine.  Tr. 66.  Dr. Fernandez's opinion does not "completely minimize" Dr. Faust's opinion regarding Prater's limitations.  Instead, Dr. Fernandez accounted for the limitations assessed by Dr. Faust.  The fact that Dr. Fernandez did not limit Prater further does not render her opinion inconsistent with the evidence in the record or the opinions of Drs. Clayton and Faust.

Prater argues, "aside from the medical evidence in 2005 which pre-dated [] Prater's claim, the only medical evidence reviewed by Dr. Fernandez was the report of Dr. Faust."  Doc.

---

[7] Prater only discusses the opinions of Dr. Clayton and Dr. Faust in her brief on the merits.  Doc. 14, pp. 11-13. Prater did not file a reply brief.

14, p. 12. Prater does not explain what specifically what medical evidence Dr. Fernandez was lacking and how it pertains to her argument. Moreover, state agency consultant Dr. Katz also reviewed Prater's complete record upon Prater's request for reconsideration and agreed with Dr. Fernandez's opinion.[8] Tr. 72-74.

A court may not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. Even if there is evidence that also supports a different conclusion, "the decision of the [ALJ] must stand if substantial evidence supports the conclusion reached. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999). Here, substantial evidence supports the conclusion reached. The ALJ followed the controlling regulations in evaluating the opinion evidence and the RFC adequately addressed the limitations. The decision of the Commissioner should be affirmed.

### VII. Conclusion and Recommendation

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: November 12, 2014

Kathleen B. Burke
United States Magistrate Judge

### **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[8] Dr. Katz added that Prater was capable of making simple decisions. Tr. 79.